## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PORTIA C. HALL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  16-447-RGA-MPT |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant | ) | |

## <u>REPORT AND RECOMMENDATION</u>

### I.    INTRODUCTION

This action arises from the denial of plaintiff's claim for Social Security benefits.

On October 22, 2009, Plaintiff filed an application for Social Security Disability

Insurance benefits and Supplemental Security Income under Title II and Title XVI of the

Social Security Act (the "Act").[1]  In her initial application, Plaintiff alleged she was

disabled due to several impairments, including fibromyalgia, arthritis, asthma, right foot

plantar fasciitis, heel spur, peroneal tendonitis, chronic obstructive pulmonary disease

(COPD) and obstructive sleep apnea (OSA).[2]  Her claims were denied initially on

February 9, 2010 and on reconsideration on July 1, 2010.[3]  Plaintiff requested a hearing

before the Administrative Law Judge ("ALJ"), who issued an unfavorable decision on

July 20, 2011.[4]  Plaintiff timely appealed to the agency's appeal council, which issued a

_____

[1] D.I. 8-2 at 56.
[2] D.I. 8-3 at 103.
[3] *Id.* at 102.
[4] *Id.* at 99-115.

remand on May 1, 2013.[5]  The remanded case was heard again before the same ALJ

on January 30, 2014.[6]  Upon the second unfavorable decision by the ALJ, Plaintiff

appealed to and was denied review by the agency's appeal council on April 18, 2016.[7]

On June 16, 2016, she filed a timely appeal with this court.[8]  Presently before the court

are the parties's cross motions for summary judgment.  For the reasons that follow, the

court recommends Defendant's motion for summary judgement be granted.

## II.    BACKGROUND

Plaintiff was born on September 17, 1960.[9]  She has a high school education and

past work experience as a cafeteria worker, retail cashier, factory worker and

newspaper inserter.[10]  In her initial filing, Plaintiff alleged her disability onset date was

July 15, 2005, but amended her onset date to June 15, 2010.[11]  In 2005, Plaintiff injured

her knee at work and required arthroscopy surgery to assess the severity.[12]  After the

operation, Plaintiff did not return to any form of work.[13]  Plaintiff claims she did not return

to work because her other ailments appeared at that time.[14]  She has since been

diagnosed with fibromyalgia and arthritis and received treatment and medication for

both conditions.[15]  Plaintiff received trigger point injections since 2012, with limited

---

[5] *Id.* at 116-121.
[6] D.I. 8-2 at 27-52.
[7] *Id.* at 4-8.
[8] *Id.* at 1-3.
[9] D.I. 8-5 at 216.
[10] D.I. 8-6 at 275, 290.
[11] D.I. 8-2 at 30-32.
[12] *Id.* at 66-67.
[13] *Id.* at 67.
[14] *Id.* at 67.
[15] D.I. 8-6 at 318-321.

success[16]  She is also affected by foot pain caused by plantar fasciitis and a heel spur in her right foot that will require surgery.[17]  Plaintiff experiences pulmonary issues that are made worse by her prolonged smoking.[18]  Despite her prior vocational experience, plaintiff claims she remained disabled under the Acts.  To be eligible, Plaintiff must demonstrate she is disabled within the meaning of §§ 216(i), 223(d), and 1614(a)(3)(A) of the Act.

A.    **Evidence Presented**

Plaintiff has experienced both joint and muscle pain since April 2005, although she was not diagnosed with fibromyalgia and arthritis until August 2008 when she began treatment with a rheumatologist, Dr. Eric Tamesis.[19]  Plaintiff experiences pain and cramping in her neck, back, shoulder, knees and chest associated with fibromyalgia and arthritis.[20]  Her pain is affected by previous injuries to her knees, including a left knee sprain in November 2004 and a later sprain in June 2005 to her right knee, which required surgery.[21]  The surgery revealed a partial medial meniscus tear and right knee osetochondral and medial femoral condyle defects.[22]  Both injuries left residual pain for which Plaintiff visited the emergency room and her treating

---

[16] D.I. 8-15 at 1015.

[17] D.I. 8-14 at 926.

[18] D.I. 8-12 at 732-737.

[19] D.I. 8-11 at 856-857.

[20] *Id.* at 856-857.

[21] D.I. 8-7 at 419-423 (discussing the November 2004 injury); D.I. 8-7 at 336-340 (adressing the June 2005 injury); D.I. 8-7 at 382-414 (discussing September 2005 surgery on injured knee).

[22] D.I. 8-7 at 396.

physician.[23]  She reinjured her left knee in February 2011, and x-rays of her knee and

hip showed mild degenerative changes and joint space narrowing.[24]  She returned to

the hospital a month later with continued pain to the medial aspect of her left knee.[25]  An

MRI revealed a largely ruptured quadriceps tendon with soft tissue and joint swelling.[26]

Plaintiff began experiencing chest pains in April 2005 resulting in her admission

to the ER for shortness of breath and chest pain.[27]  Her treating physician, Dr. Sharad

Patel, found the pain was likely musculoskeletal rather than cardiac.[28]  A year later in

September 2006, Plaintiff reported to Dr. Patel that she was experiencing chest and

shoulder pains.  Thereafter, she was admitted to the hospital for chest pains in July

2007.[29]  Dr. Patel concluded the pain was likely muscoskeletal rather than cardiac or

pulmonary.[30]  When Plaintiff was hospitalized in July 2008 for muscle spasms and body

aches, she was referred to a rheumatologist, Dr. Tamesis, who later diagnosed

fibromyalgia and possible inflammatory arthritis.[31]

Dr. Tamesis proscribed a course of physical therapy, as well as, the medications

Volatrin, Ultram and later Prednisone to manage her pain.[32]  Plaintiff saw little

---

[23] D.I. 8-11 at 585 (concerning emergency room visit); D.I. 8-12 at 598 (discussing visit to Dr. Brace).
[24] D.I. 8-13 at 804-814.
[25] D.I. 8-14 at 887.
[26] *Id.* at 888.
[27] D.I. 8-7 at 345-352.
[28] D.I. 8-11 at 595.
[29] *Id.* at 590 (relating visit with Patel); D.I. 8-10 at 555 (discussing visit to the ER).
[30] D.I. 8-11 at 587.
[31] D.I. 8-9 at 538 (regarding ER visit); D.I. 8-11 at 627-628 (discussing referral to rheumatologist).
[32] D.I. 8-11 at 656-661.

4

improvement in her pain with this course of medications.[33]  In November 2008, she was hospitalized for body aches.[34]  Plaintiff changed physicians in June 2009 from Dr. Tamesis to Dr. Maged Hosny, her current rheumatologist.[35]  Dr. Hosny added Vicodin, Zanaflex, Methotrexate and Tylenol with codeine to Plaintiff's regimen, which seemed to stabilize her level of pain starting in June 2010.[36]  Before June 2010, Plaintiff was admitted to the emergency room once for chest pains and once for body aches.[37]

In February 2010, a non-treating state medical consultant, Dr. V.K. Kataria, reviewed Plaintiff's medical record and completed an RFC form.[38]  Dr. Kataria's RFC form reported that the plaintiff could occasionally lift up to twenty pounds and could frequently lift up to ten pounds.[39]  Further, Dr. Kataria found that Plaintiff was be able to stand for at least two hours and sit for at least six hours during an eight hour work day.[40]  Dr. Kataria also declined to put any limitations on Plaintiff's ability to push or pull.[41]

Plaintiff changed her primary physician in August 2010 from Dr. Patel to Dr. Jack Milligan, who mostly treated her for symptoms of anxiety.[42]  Dr. Milligan's records noted that Plaintiff was being treated by Dr. Tamesis and Dr. Hosny for her muscoskeletal impairments, but did not comment on her fibromyaglia or arthritis.[43]  Dr. Milligan

---

[33] *Id.*
[34] D.I. 8-9 at 489-525.
[35] D.I. 8-11 at 609.
[36] *Id.* at 873-881.
[37]  D.I. 8-12 at 686 (chest pain);D.I. 8-12 at 688 (body aches).
[38] D.I. 8-11 at 649-655.
[39] *Id.* at 650.
[40] *Id.*
[41] *Id.*
[42] D.I. 8-14 at 889-924.
[43] *Id.* at 889-924.

completed an RFC finding in April 2011 that concluded Plaintiff was unable to stand, walk or sit for more than two hours during an eight hour work day .[44]  Another non-treating state medical consultant, Dr. Nisha Singh, completed an RFC form in July 2010 that confirmed Dr. Kataria's RFC findings from February 2010, which contradicted Dr. Milligan's RFC finding.[45]

In June 2010, Plaintiff began seeing a specialist for asthma and was treated for sleep apnea and other pulmonary issues with a CPAP machine and inhalers.[46]  Plaintiff also started treatment with a podiatrist in June 2010, Dr. Fanta Morgan, who assessed her foot pain as related to plantar fasciitis and diabetic neuropathy.[47]  Dr. Morgan diagnosed a heel spur in early April 2011 and surgery was scheduled, but was not performed due to the death of her husband.[48]

Since her hearing before the ALJ in 2011, Plaintiff continued treatment with Drs. Hosny, Milligan and Morgan.  There have been few notable changes in Plaintiff's medical history since that date.  Dr. Hosny introduced trigger point injections in 2012. Plaintiff continues to show no signs of visible swelling in her joints.[49]  Dr. Milligan only treats Plaintiff for anxiety or general health issues.[50]  Dr. Morgan treats Plaintiff for onychomycosis, neuropathy and tendonitis.[51]  In October 2013, Plaintiff was fitted with a

---

[44] *Id.* at 882-886.
[45] D.I. 8-12 at 731.
[46] D.I. 8-12 at 732- 737.
[47] D.I. 8-14 at 928-938.
[48] *Id.* at 926-927.
[49] D.I. 8-15 at 1000-1015.
[50] D.I. 8-14 at 890-924.
[51] D.I. 8-15 at 985-998.

special brace for her foot pain.[52]

### B. Hearing Testimony

#### 1. *Plaintiff's Testimony- ALJ Hearing 2011*

At her first administrative hearing on June 9, 2011, plaintiff testified to her background, work history and alleged disability.[53]  Plaintiff lived with her disabled husband until his death in May 2011.[54]  She also had custody over her thirteen year old great-niece.[55]  Plaintiff does not have a license and relies on public transportation or her adult children to drive her.[56]  Her niece assisted her with dressing, including buttoning and zippering and putting on shoes.[57]

Plaintiff has no technical training, but has a high school degree.[58]  She has remained unemployed since 2005 after working as a custodian for Delaware State University.[59]  This position required her to stand and walk for most of the day and lift heavy items.[60]  Before her custodian position, Plaintiff worked in a factory removing products from a machine.[61]  This position required her to lift objects over fifteen pounds and to stand for most of the day.[62]  Prior to her factory job, Plaintiff worked as a cashier for several commercial retailers.[63]

---

[52] *Id.* at 989.
[53] *See generally* D.I. 8-2.
[54] D.I. 8-2 at 62.
[55] *Id.* at 62.
[56] *Id.* at 62-63.
[57] *Id.* at 81.
[58] *Id.* at 63.
[59] *Id.*
[60] *Id.* at 64.
[61] *Id.*
[62] *Id.*
[63] *Id.* at 65.

Plaintiff testified that she stopped working in 2005 at Delaware State University after she injured her knee and more health conditions developed.[64]  She did not file for disability until 2009 despite being unemployed for a number of years.[65]  In her testimony, Plaintiff claimed the most limiting problem is swelling of her ankles.[66]  At the time of the hearing, Plaintiff wore a knee brace as a result of a recent fall and used a cane and boot to ambulate.[67]  She also complained of knee pain and arthritis that was being treated with Prednisone.[68]  She experienced an initial good response to Prednisone, but testified this medication was no longer helping, although she continued to take it.[69]  Plaintiff further testified to experiencing muscle spasms and cramps from her fibromyalgia, which was unresponsive to medication.[70]

Plaintiff claimed that she is unable to walk or stand for an hour, but she is able to climb stairs to get to her bedroom.[71]  She contended that she cannot sit for more than an hour or lift more than five pounds,[72] and is unable to bend forward, kneel or stoop.[73]  She can hold utensils and her toothbrush, write a grocery list, turn knobs,[74] use a microwave and make basic foods, such as sandwiches.[75]  With breaks, Plaintiff is able

---

[64] *Id.* at 67.
[65] *Id.* at 68.
[66] *Id.*
[67] *Id.* at 70.
[68] *Id.* at 72.
[69] *Id.* at 72-73.
[70] *Id.* at 74.
[71] *Id.* at 80.
[72] *Id.*
[73] *Id.*
[74] *Id.* at 82.
[75] *Id.* at 84.

to do household cleaning chores, and can leave her home to pay bills and food shop.[76]
Plaintiff served as the sole caretaker for her disabled husband before his death.[77]

### 2. Plaintiff's Testimony- ALJ Hearing 2014

At the second hearing on January 30, 2014, Plaintiff confirmed her background, work history and alleged disability.[78] She claimed that she had plantar fasciitis and tendonitis in her right foot, which required continued use of an orthotic boot.[79] She still experienced knee pain in both knees and excessive swelling.[80] Plaintiff related a recent fall onto her left knee in December 2013 and expected to undergo physical therapy for the injury.[81] Besides this prospective physical therapy treatment and medication for pain relief, no additional treatment was prescribed.[82] She admitted that some medications help with the pain and spasms associated with her arthritis and fibromyalgia.[83] Plaintiff also experiences difficulty catching her breath.[84]

In describing her physical abilities, Plaintiff claimed that she cannot stand or walk for more than five minutes. She can sit for unlimited periods without getting out of breath.[85] She also contended that Dr. Milligan imposed a ten pound weight lifting restriction on her.[86] On further questioning, Plaintiff then responded that she cannot

---

[76] *Id.* at 84-85.
[77] *Id.* at 86.
[78] *See generally* D.I. 8-2.
[79] *Id.* at 35.
[80] *Id.* at 39.
[81] *Id.*
[82] *Id.* at 40.
[83] *Id.* at 41.
[84] *Id.* at 43.
[85] *Id.* at 36.
[86] *Id.* at 37.

walk or stand for up to a half an hour and is unable lift more than five pounds.[87]

### 3. Vocational Expert Testimony

Testimony was provided by a different vocational expert at each of the hearings, although the same ALJ presided over both hearings. During the first hearing on June 9, 2011, vocational expert Adina Leviton testified to Plaintiff's background, skills and limitations, and the jobs available within her restrictions.[88] Leviton classified Plaintiff's past experience as a cafeteria worker as semi-skilled with light exertion, her cashier position as semi-skilled with light exertion, and her factory worker position as unskilled medium exertion work.[89]

Leviton addressed two hypothetical situations posed by the ALJ and Plaintiff's attorney based on a 44-year-old woman with a high school education and Plaintiff's past work history.[90] The ALJ's hypothetical concerned the above described individual working at a light exertion level, and limited to standing or walking for two hours in an eight hour work day with occasional postural activities.[91] The individual could perform frequent, but not, constant handling, fingering and feeling.[92] The hypothetical person would also not be exposed to concentrated exposure to vibrations, hazards, odors, dusts or fumes.[93] In response, Leviton testified that the hypothetical individual could be employed as an office worker, counter clerk, or mail clerk,[94] and with such positions

---

[87] *Id.*
[88] *Id.* at 89.
[89] *Id.* at 89-90.
[90] *Id.* at 90-92.
[91] *Id.* at 90.
[92] *Id.*
[93] *Id.*
[94] *Id.* at 91.

available in the national economy and consistent with the definitions found in the

Dictionary of Occupational Titles (DOT), a vocational manual used by the Social

Security Administration.[95]

Plaintiff's attorney posed a hypothetical involving the same individual, who had

the additional limitations of being unable to sit, stand, or walk for more than two hours a

day.[96]  Further, this hypothetical individual could not lift more than ten pounds and was

limited to handling and fingering to 20% of the day.[97]  The hypothetical person would

also be absent three times a month due to pain and symptoms.[98]  Under this

hypothetical, Leviton found that an individual with those restrictions would be unable to

work.[99]

Another vocational expert, James Michael Ryan, testified at the second ALJ

hearing on January 30, 2014.[100]  Ryan agreed with the assessment of the prior

vocational expert that plaintiff's prior work skills were not transferrable.[101]  The

hypothetical individual in this hearing was 50 years old, rather than 44 years, as in the

prior hearing.[102]  The ALJ posed a hypothetical of an individual with the same limitations

as proscribed the 2011 hearing.  Ryan agreed with the prior expert regarding type of

jobs a person with those limitations could perform, and only disagreed with the amount

---

[95] *Id.* at 91-92.
[96] *Id.* at 92.
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.* at 45.
[101] *Id.* at 46.
[102] *Id.*

of jobs available.[103]  Ryan also agreed that the an individual with the limitations added

by Plaintiff's counsel could not sustain full time employment.[104]  Ryan further explained

how the positions of a mail clerk, office helper and counter clerk could be classified as

light work as follows:

> There are two ways occupations fit into the light category.  First of all,
> whether or not the individual is standing, moving about — and the lifting
> can be incidental in a case like that– or almost like the opposite of that is
> true, the individual may be seated most of the time, but they're either
> handling at an increased pace, or they're handling items that normally
> are over two pounds.[105]

Ryan concluded that the positions he described for Plaintiff fell in the light work

category.[106]

## C.    The ALJ 's Findings

Based on the medical evidence and testimony provided in the 2011 and

2014 hearings, the ALJ determined plaintiff was not disabled, and therefore, ineligible

for Social Security Disability Insurance and Supplemental Security Income.[107]  The

ALJ's findings from the 2014 hearing, the disability decision at issue, are summarized

as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since June 15, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

---

[103] *Id.* at 47.
[104] *Id.* at 49.
[105] *Id.* at 50.
[106] *Id.*
[107] *Id.* at 9.

3.      The claimant has the following severe impairments: Obesity; Fibromyalgia; Arthritis involving several areas of her body, including hands and knees; Right Foot Plantar Fasciitis, Heel Spur; And Peroneal Tendonitis; Asthma; Chronic Obstructive Pulmonary Disease; and Obstructive Sleep Apnea (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except standing and/or walking for 2 hours out of an 8 hour workday; no more than occasional postural activities such as stooping, crouching, and crawling, except not climbing of ladders, ropes, or scaffolds; should avoid concentrated exposure to odors, fumes, dusts, gases, poor ventilation, vibration, and hazards, such as heights and moving machinery; and handling, fingering, feeling limited to frequent as opposed to constant.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on September 17, 1960 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed [her] age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-

13

> Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

> 10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

## III.  STANDARD OF REVIEW

### A.  Motion for Summary Judgment

Both parties moved for summary judgment.  In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the nonmoving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[108]  If there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[109]

This standard does not change merely because there are cross-motions for summary judgment.[110]  Cross-motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[111]

"The filing of cross-motions for summary judgment does not require the court to grant

---

[108] *Reeves v. Sanderson Plumbing, Prods., Inc.*, 530 U.S. 133, 150 (2000).

[109] *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

[110] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[111] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

summary judgment for either party."[112]

## B.    Court's Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of the ALJ's decision by the

district court.  The court may reverse the Commissioner's final determination only if the

ALJ did not apply the proper legal standards, or the record did not include substantial

evidence to support the ALJ's decision.  The Commissioner's factual decisions are

upheld if supported by substantial evidence.[113]  Substantial evidence means less than a

preponderance of the evidence, but more than a mere scintilla of evidence.[114]  As the

United States Supreme Court has found, substantial evidence "does not mean a large or

significant amount of evidence, but rather such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."[115]

In determining whether substantial evidence supports the Commissioner's

findings, the court may not undertake a de novo review of the Commissioner's decision

and may not re-weigh the evidence of record.[116]  The court's review is limited to the

evidence that was actually presented to the ALJ.[117]  The Third Circuit has explained that

a:

> single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it is overwhelmed by other evidence,
> particularly certain types of evidence (e.g., evidence offered by treating

---

[112] *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

[113] 42 U.S.C. *§§* 405(g), 1383(c)(3); *see also Monsour Medical Center v. Heckle*m, 806 F .2d 1185, 1190 (3d Cir. 1986).

[114] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

[115] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

[116] *Monsour*, 806 F.2d at 1190.

[117] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001)

physicians) or if it really constitutes not evidence but mere conclusion.[118]

Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable.[119] Even if the court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision so long as that decision is supported by substantial evidence.[120]

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision."[121] In *Securities & Exchange Commission v. Chenery Corp.*,[122] the Supreme Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."[123] The Third Circuit has recognized the applicability of this finding in the Social Security disability context.[124] Thus, this court's review is limited to the four corners of the ALJ's decision.[125]

### C.    ALJ's Disability Determination Standard

The Supplemental Social Security Income (SSI) program was enacted in 1972 to

---

[118] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).
[119] *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).
[120] *Monsour*, 806 F .2d at 1190-91.
[121] *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).
[122] *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947).
[123] *Id.*
[124] *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001).
[125] *Cefalu v. Barnhart*, 387 F. Supp.2d 486, 491 (W.D. Pa. 2005).

assist "individuals who have attained the age of 65 or are blind or disabled" by setting a minimum income level for qualified individuals.[126]  A claimant – in order to establish SSI eligibility – bears the burden of proving that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than twelve months."[127]  Moreover, "the physical or mental impairment or impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy."[128]  Furthermore, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are evidenced by medically acceptable clinical and laboratory diagnostic techniques.[129]

### 1.    Five-Step Test.

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled.[130]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.

---

[126] *See Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982 ed.)).
[127] 42 U.S.C. § 423(d)(1)(A).
[128] 42 U.S.C. § 423(d)(2)(A).
[129] 42 U.S.C. § 423(d)(3).
[130] *See* 20 C.F.R. §416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).

In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits. In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  The claimant bears the burden of demonstrating an inability to return to her past relevant work.  If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  The ALJ will often seek the assistance of a vocational expert at this fifth step.[131]

If the ALJ determines that a claimant is disabled at any step in the sequence, the

analysis stops.[132]

## 2.    Weight Given to Treating Physicians

"A cardinal principle guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight."[133]  Moreover, such reports will be given

controlling weight where a treating source's opinion on the nature and severity of a

claimant's impairment is well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence on

---

[131] *Plummer*, 186 F.3d at 427.
[132] *See* 20 C.F.R § 404.1520(a)
[133] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

record.[134]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[135]  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[136]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion:  rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case.[137]  Therefore, only the ALJ can make a disability determination.

### 3.    Evaluation of Subjective Accounts of Pain[138]

Statements about the symptoms[139] alone never establish the existence of any impairment or disability.  The Social Security Administration uses a two-step process to evaluate existence and severity of symptoms.

### 4.    Existence of Pain

First, the ALJ must find a medically determinable impairment – proven with

---

[134] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).

[135] *Morales v. Apfel*, 225 F.3d 310, 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).

[136] *Plummer*, 186 F.3d at 429.

[137] *See* 20 C.F.R. § 416.927 (e)(1).

[138] *See* 20 C.F.R §§ 416.928-29. *See also* SSR 96-7p.

[139] A symptom is an individual's own description of physical or mental impairments such as pain, fatigue, shortness of breath and other complaints.  *See* SSR 96-7p.

medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the claimant's symptoms.  Otherwise, the ALJ cannot find the applicant disabled, no matter how genuine the symptoms appear to be.

This step does not consider the intensity, persistence and limiting effects of the symptoms on the claimant:  it only verifies whether a medical condition exists that could objectively cause the existence of the symptom.

Analysis stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 CFR Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*.

### 5.    Severity of Pain

At step two, the ALJ must determine the extent to which the symptoms limit the claimant's ability to do basic work activities.  Therefore, he must determine the applicant's credibility.[140]

At this step, the ALJ must consider the entire record, including medical signs, laboratory findings, the claimant's statements about symptoms, any other information provided by treating or examining physicians and psychologists, and any other relevant evidence in the record, such as the claimant's account of how the symptoms affect his activities of daily living and ability to work.[141]

Where more information is needed to assess a claimant's credibility, the ALJ must

---

[140] Credibility is the extent to which the statements can be believed and accepted as true.

[141] *See* 20 C.F.R. § 404.1529.

make every reasonable effort to obtain available information that would shed light on that issue. Therefore, the ALJ must consider the following factors relevant to symptoms, only when such additional information is needed:

(i)  The applicants' account of daily activities;

(ii)  The location, duration, frequency, and intensity of pain or other symptoms;

(iii)  Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication the applicant takes or has taken to alleviate pain or other symptoms;

(v)  Treatment, other than medication, the applicant receives or has received for relief of pain or other symptoms;

(vi)  Any measures the applicant uses or has used to relieve pain or other symptoms (e.g., lying flat, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)  Other factors concerning functional limitations and restrictions due to pain or other symptoms.[142]

### 6.    Factors in Evaluating Credibility[143]

A claimant's statements and reports from medical sources and other persons with regard to the seven factors, noted above, along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility.

---

[142] *See* 20 C.F.R. § 404.1529
[143] *See* SSR 96-7p.

Consistency with the record, particularly medical findings, supports a claimant's credibility.  Since the effects of symptoms can often be clinically observed, when present, they tend to lend credibility to a claimant's allegations.  Therefore, the adjudicator should review and consider any available objective medical evidence concerning the intensity and persistence of pain or other symptoms in evaluating the claimant's statements.

Persistent attempts to obtain pain relief, increasing medications, trials of different types of treatment, referrals to specialists, or changing treatment sources may indicate that the symptoms are a source of distress and generally support a claimant's allegations.  An applicant's claims, however, may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of the analysis.  Such opinions are not given controlling weight.  However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability.  The ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain – provide sufficiently specific reasons based on the record – to the claimant and any subsequent reviewers, the weight afforded to the

22

claimant's statements and the reasons therefore.

The law recognizes that the claimant's work history should be considered when evaluating the credibility of her testimony or statements.[144] A claimant's testimony is accorded substantial credibility when she has a long work history, which demonstrates it is unlikely that, absent pain, she would have ended employment.[145]

### 7. Medical Expert Testimony

The onset date of disability is determined from the medical records and reports and other similar evidence, which requires the ALJ to apply informed judgment.[146] "At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred."[147]

## IV. DISCUSSION

### A. Parties' Contentions

Plaintiff argues the ALJ's RFC findings are inconsistent with Agency policy. She contends that based on Agency rules and the grid system, the ALJ should have assessed her as capable of only sedentary rather than light work.[148] Plaintiff further maintains that even if her conditions fell between two grid rules, the ALJ failed to adhere

---

[144] *See* 20 C.F.R. § 404.1529(a)(3)

[145] *See Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984) citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981). In *Podedworny*, the claimant worked for thirty-two years as a crane operator for one company. He had a ninth grade education and left his employment after the company physicians determined that his symptoms of dizziness and blurred vision prevented him from safely performing his job.

[146] *See* SSR 83-20.

[147] *Id.*

[148] D.I. 14 at 2.

to the Agency's mandatory Program Operations Manual System ("POMS") which direct the ALJ to apply the sedentary Medical-Vocational rules. She contends that under POMS, the ALJ had a duty to explain her decision to apply the light work rule.[149] Plaintiff further argues that the ALJ failed to give weight to her treating physician, Dr. Jack R. Milligan, and instead gave more weight to other medical opinions.[150]

Alternatively, Defendant argues that substantial evidence supports the ALJ's application of the light work rules, and vocational experts Leviton and Ryan were consulted when Plaintiff fell between grid categories.[151] The experts were able to identify occupations that Plaintiff could perform in the light exertion category which did not conflict with her limitations.[152] Defendant also contends that the ALJ's decision to give Dr. Miligan's opinion little weight was supported by substantial evidence since he did not treat her for joint or muscle pain.[153]

### B.    Disability Analysis

Title II of the Social Security Act, 42 U.S.C. § 423(a)(l)(D), "provides for the payment of insurance benefits" to those who contributed to the program and suffer from a physical or mental disability.[154] In order to qualify for DIB, a claimant must establish that she was disabled prior to the date she was last insured.[155] A "disability" is defined as the inability to do any substantial gainful activity because of any medically

---

[149] *Id.* at 13-14.
[150] *Id.* at 16.
[151] D.I. 16 at 1.
[152] D.I. 8-12 at 47.
[153] *Id.*
[154] *Bowen*, 482 U.S. at 140.
[155] 20 C.F.R. § 404.131.

determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least 12 months.[156]  To be disabled, the severity of the impairment must prevent return to previous work, and considering age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy."[157]

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.[158]  If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner does not review the claim further.[159]  At the first step, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.  If the claimant is so engaged, a finding of non-disabled is required.[160]  If the claimant is not so engaged, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe.  If the claimant is not suffering from either, a finding of non-disabled is required.[161]

If the claimant's impairments are severe, the Commissioner, at the third step, compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work.[162]  When a claimant's impairment

---

[156] 42 U.S.C. §§ 423(d)(l)(A), 1382(c)(a)(3).

[157] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

[158] 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422,427-28 (3d Cir. 1999).

[159] 20 C.F.R. § 404.1520(a)(4).

[160] 20 C.F.R. § 404.1520(a)(4)(i).

[161] 20 C.F.R. §404.1520(a)(4)(ii).

[162] 20 C.F.R. § 404.1520(a)(4)(iii); *see also Plummer*, 186 F.3d at 428.

or its equivalent matches an impairment in the listing, the claimant is presumed

disabled.[163]  If a claimant's impairments, either singularly or in combination, fail to meet

or medically equal any listing, the analysis continues to steps four and five.[164]  At step

four, the Commissioner determines whether the claimant retains the RFC to perform his

past relevant work.[165]  A claimant's RFC is "that which an individual is still able to do

despite the limitations caused by [his] impairment(s)."[166]  "The claimant bears the burden

of demonstrating an inability to return to [her] past relevant work."[167]

If the claimant is unable to return to her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude adjusting to

any other available work.[168]  At this last step, the burden rests with the Commissioner to

show the claimant is capable of performing other available work existing in significant

nations numbers and consistent with the claimant's medical impairments, age,

education, past work experience, and RFC before denying disability benefits.[169]  In

making this determination, the ALJ must analyze the cumulative effect of all the

claimant's impairments, and often seeks the assistance of a vocational expert.

### 1.    Weight Accorded to Treating Physician

It is the exclusive responsibility of the ALJ to weigh the evidence in the record as

---

[163] 20 C.F.R. § 404.1520(a)(4)(iii).
[164] 20 C.F.R. § 404.1520(e).
[165] 20 C.F.R.. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428.
[166] *Fargnoli*, 247 F.3d at 40.
[167] *Plummer*, 186 F.3d at 428.
[168] 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *see also Plummer*, 186 F.3d at 428.
[169] *Id.*

a whole in making a disability decision.[170]  The evidence presented to the ALJ may contain differing medical opinions from both treating and non-treating physicians, as well as other testimony.[171]  Normally, the evidence presented by the treating physician is given controlling weight as that individual may be most acquainted with the medical history of the claimant.  However, in circumstances where the treating physician's opinion is not consistent with the record as a whole or is not well supported by "medically acceptable clinical and laboratory diagnostic techniques", an ALJ may reasonably accord little weight to the treating physician's opinion.[172]  Defendant in this case argues that Dr. Milligan's medical opinion was given little weight because it was inconsistent with the record as a whole and not well supported.  This court finds that the proper level of deference was given to Dr. Milligan's medical opinion.

The ALJ found that while Dr. Milligan may have been Plaintiff's primary care physician, his treatment records did ". . . not contain significant complaints of pain or functional limitations related to . . . [Plaintiff's] severe impairments."[173]  Dr. Milligan treated Plaintiff eight times over a couple of years, and his notes do not indicate that he examined or treated Plaintiff for fibromyalgia, arthritis, or foot pain.  Instead, Dr. Milligan usually addressed Plaintiff complaints of anxiety, a condition not considered a severe impairment by the ALJ.[174]  His treatment records do not support his conclusion that Plaintiff was limited in her ability to sit or lift items beyond ten pounds, and therefore the

---

[170] See 20 CFR 404.1527(e)(2)
[171] See 20 CFR 404.1512
[172] See 20 CFR 404.1527(c)
[173] D.I. 8-2 at 18.
[174] D.I. 8-14 at 889-924.

ALJ did not give Dr. Milligan's opinion controlling weight.

The medical opinion of Dr. Milligan also conflicts with the record as a whole. The treatment records of Dr. Hosny, Plaintiff's rheumatologist, found that, despite complaints of pain, Plaintiff had a normal gait and no joint swelling that typically accompanied arthritis and fibromyalgia. Dr. Hosny declined to comment on Plaintiff's ability to sit for any period of time.

Dr. Milligan's RFC also conflicts with Plaintiff's own testimony at the ALJ hearing. When asked if she had any limitations in sitting, Plaintiff responded that she had no limitations.[175] Dr. Milligan's RFC, however, stated Plaintiff could not sit for more than two hours in a day.[176] Thus, his medical opinion not only conflicts with the medical record, but the record as a whole, and is not controlling. The ALJ's rejection of Dr. Milligan's medical opinion was neither speculative nor based lay opinion, but was due to the doctor's contradiction with the record. The ALJ is required to weigh the medical opinion of Dr. Milligan with the rest of the evidence presented to judge Plaintiff's RFC. Based on the inconsistencies and lack of support for Dr. Milligan's opinion, the ALJ properly attributed in her conclusion little weight and assigned more deference to the non-treating state medical consultant.

Plaintiff also contends that the ALJ assigned improper weight to the "outdated" opinion of the state agency consultants. Defendant argues that the opinions of the state medical consultants, Dr. Singh and Dr. Kataria, were properly weighed along with any

---

[175] D.I. 8-2 at 45.
[176] D.I. 8-14 at 882-886.

further records developed after the 2010 RFC.  Plaintiff's contention that the ALJ's decision was made based on outdated opinions fails to recognize that the ALJ did weigh more recent medical records from rheumatologist Dr. Hosny and podiatrist Dr. Morgan along with records from a Physician Assistant with Kent Pulmonology Associates. Significantly, the ALJ considered the 2013 RFC opinion of the Physician Assistant in restricting Plaintiff's exposure to certain substances.

Plaintiff also failed to present any adequate RFC findings from her other treating physicians, instead relying on Dr. Milligan's contradictory opinion and an opinion from a physician's assistant, which has less authority.  Based on the evidence that was presented to the ALJ, which was the partial responsibility of Plaintiff to submit, the RFC findings of the state medical consultants were the most consistent with the record as a whole, and thus, properly given more deference.  There is no evidence that the ALJ improperly relied on the testimony of the state medical personnel.

### 2.    The ALJ's RFC Finding

Plaintiff argues that the ALJ incorrectly found an RFC for light work, rather than for sedentary work, which would have resulted in a finding of disability.[177]  In contrast, Defendant contends the ALJ properly determined that Plaintiff was capable of light work.[178]  This court finds that the ALJ properly applied the standards under the Agency Regulations, and substantial evidence supports the ALJ's decision.  The analysis for this conclusion is two-fold.

---

[177] D.I. 14 at 2.
[178] D.I. 16 at 1.

### A.    Plaintiff fell between grid categories

Plaintiff contends that the sedentary category is applicable because her abilities are consistent with the full range of work requirements for a sedentary RFC.[179]  An RFC for sedentary work includes strength requirements for standing, walking, lifting and carrying.  Sedentary work, as defined by SSA regulations, is occasional walking and standing "occasionally" with occasional or occasionally defined as "occurring from very little up to one-third of the time."[180]  The lifting and carrying requirements are defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools."[181]

As the RFC findings of the state medical consultants, Dr. Singh and Dr. Kataria, were given more weight, the ALJ in 2014 found that Plaintiff was able to sit for up to six hours and stand for up to two hours during an eight hour day.  The ALJ also determined Plaintiff could lift up to twenty pounds occasionally and up to ten pounds frequently.  Although Plaintiff's limitations fall within sedentary work, her abilities extend beyond this level and into the light work category.

The full range of standing and walking requirements in light work fall into two categories.  The first category provides that "the full range of light work requires standing or walking, off or on, for a total of approximately 6 hours of an 8-hour workday".[182]  The second definition categorizes a job as light work when "it involves sitting most of the time

---

[179] D.I. 14 at 8-9.
[180] 1983 SSR LEXIS 30, *12-13
[181] *Id.*
[182] *Id.* at 13-14.

but with some pushing and pulling of arm-hand or leg-foot controls, which requires greater exertion than in sedentary work . . . ."[183]  The lifting and carrying requirements for "light work [is] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."[184]

The ALJ found plaintiff could lift 20 pounds occasionally and 10 pounds frequently.  Despite arguments that lifting and carrying require standing, Plaintiff is capable to perform beyond the sedentary category.  Therefore, the ALJ properly found Plaintiff fell outside the grid category for sedentary work, and applied SSR 83-12, which governs when an applicant's exertional levels fall between two grid rules.  In reaching her conclusion, the ALJ consulted a vocational expert to understand the exertional capacity of Plaintiff.

The SSR 83-12 governs in this case, rather than the POMS Rules because the POMS Rules were not promulgated at the time of the hearing,[185] an important factor in the court's evaluation as the review is limited to the evidence actually submitted to the ALJ.[186]  Since the ALJ would not have been provided the examples given in POM DI 25025.015 or POMS DI 25016.006, nor is there evidence of any similar provisions promulgated before the hearing, the POM Rules are not applicable to this matter.  Thus, the ALJ properly employed SSR 83-12 for her analysis of the two guideline categories.

### B.    The ALJ properly relied on the testimony of the VE

---

[183] *Id.*
[184] *Id.*
[185] D.I. 8-14 at 9.
[186] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001)

Plaintiff argues the testimony of the Vocational Expert is unreliable because it conflicts with SSA policy.  Defendant contends, although the testimony of a VE cannot be relied on if it conflicts with SSA policy, in this case there is no variation between the testimony of the VE and SSA policy.  Based on the testimony of the VE, this court finds it does not conflict with SSA policy and was properly relied on.

Whenever an accusation is raised that a conflict exists between SSA policy and VE testimony, SSA policy controls unless proven that no conflict exists.  Plaintiff maintains that a variation exists between the SSA's regulatory definitions for light work and the VE testimony regarding lifting and carrying requirements.  Plaintiff also contends that the lifting and carrying requirements would require her to stand or walk for more than two hours, which she is incapable of doing.  The guidelines operate as the full range of work, and when an individual can perform variations of those guidelines, they are not inconsistent with the VE testimony.

Further, the VE provides a reasonable explanation.  The VE testified that there are two ways for an individual to fall under a light work category:  when the individual is standing and moving around with incidental lifting _or_ when the individual could be seated most of the time and handle items over 10 pounds.[187]  This testimony is consistent with the definitions in SSA policy where light work category either "requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs" _or_ "involves sitting most of the time but with some pushing and pulling of arm-hand or

---

[187] See _supra_ note 101.

leg-foot controls, which require greater exertion than in sedentary work."[188]  Since the

testimony of the VE and SSA policy in this regard are consistent, the ALJ properly relied

on the testimony of the VE that jobs existed in the economy which Plaintiff could perform.

This matter is distinguishable from *Ford v. Colvin* because in *Ford*, the testimony

from the VE and the resulting ALJ's findings on why the plaintiff fell within the light work

category with those limitations was less detailed or more conclusory.[189]  In the absence

of an adequate explanation, the testimony of the VE in *Ford* conflicted with SSA policy.[190]

In the present case, the VE testimony is consistent with the definitions of the light work

category under SSA policy.

## V.    CONCLUSION

For the foregoing reasons, I recommend that:

(1) Plaintiff's motion for summary judgment (D.I. 11) be denied; and

(2) Defendant's motion for summary judgment (D.I. 15) be granted.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R.

CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific written

objections within fourteen (14) days after being served with a copy of this Report and

Recommendation.  Objections and responses are limited to ten (10) pages each.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for

Objections Filed under FED. CIV. P. 72, dated October 9, 2013, a copy of which is

---

[188] 1983 SSR LEXIS 30, *3-4
[189] No. 1:14-cv-01046-RGA, 2015 LEXIS 99991 (D.Del. Jul. 31, 2015).
[190] *Id.*

available on the Court's website, www.ded.uscourts.gov.

Date:  July 27, 2017                    /s/ Mary Pat Thynge
                                        Chief U.S. Magistrate Judge